[Civ. No. 31927. Second Dist., Div. Two. Oct. 31, 1968.]

TED ITANO, Plaintiff and Respondent, v. COLONIAL
YACHT ANCHORAGE, Defendant and Appellant.

Fletcher & Rauch and Bruce I. Rauch for Defendant and Appellant.

Anthony W. Bright for Plaintiff and Respondent.

ROTH, P. J.—Appellant, Colonial Yacht Anchorage, a California corporation, appeals from a judgment on a jury verdict of $9,150 in favor of respondent Ted Itano, and from an order denying a motion for judgment notwithstanding the verdict.

Appellant operates a ship repair yard and maintains a wharf for the mooring of boats.

Respondent purchased the "Rum-N-Coke," a 48-foot commercial fishing boat, in August 1964, from one James A. Hickox. At the time of purchase the boat was moored at appellant's wharf in Wilmington.

Hickox, the original owner, had executed a written form lease with appellant which provided for monthly wharf fees and contained language reserving to appellant "the right to assign or move any boat to any other mooring at any time."

Concurrently with the purchase of the boat, in August 1964, appellant was informed of the sale and it adjusted its records to reflect the change in ownership.

Respondent never signed a lease to show that Hickox assigned his lease or that appellant consented to an assignment. In fact respondent testified that he did not even know of the lease.

Respondent continued to occupy the same mooring space and was billed therefor.

Respondent did not maintain a punctual or complete payment record. The records of Colonial showed that his first

payment was made in January. It was not a full payment of the amount then due. Respondent admitted he was continually delinquent in his payments to appellant, could not remember when he made his first payment, but knew he was behind in payments.

The property upon which Colonial carries on its business is owned, in fee, by the City of Los Angeles. In consideration for the use of the property, Colonial pays to the City a percentage of the amount billed for mooring vessels in the regular mooring area, whether or not they collected the money from their customers. No amount is payable to the City for mooring vessels in the work area of the anchorage.

In March 1965, in order to "free us the slip that he was occupying . . . so we could re-rent it to a good-paying mooring customer" appellant moved respondent's boat to a work slip approximately half a mile from what had been its regular mooring place. In its new mooring the boat was secured with a cable and lock across the slip opening. Respondent subsequently paid the delinquent charges and the boat was returned to its original mooring space.

Late in March or early April 1965, Colonial, by telephone, requested respondent to obtain mooring elsewhere. Colonial told respondent it would allow him one week within which to find a new mooring, but that if the Rum-N-Coke continued on Colonial's wharf in April, Itano must pay the April mooring charge in advance. By April 15 he had not moved the boat nor paid the slip hire.

On April 20, 1965, Colonial, by letter, informed respondent that the April payment had not been received and requested him to move his boat elsewhere. Respondent thereafter had a conversation with someone at Colonial who asked him to move the boat immediately, but extended the time to May 31 because of the difficulties respondent had been having trying to find another place for his boat, on condition he paid at that time for April and May. Respondent did make the April and May payments (less 40 cents) on or about May 27.

On May 27, 1965, Colonial sent a second letter to respondent reminding him to move the boat by May 31, and advising that if he did not Colonial would tow it to their "locked-up" area.

Respondent, in answer, advised that "I would still move the boat out if I found a moorage," did not move the boat and had no further communication with appellant, although he testified that he did use the boat after that time.

On June 17, 1965, the boat was towed to the work slip. It

was secured by a lock and cable across the slip opening. On the morning of June 23, 1965, the boat was discovered to be sunk at the work slip.

It is unclear how many days the boat remained in the water. The actual raising of the boat took six hours. Evidence indicated that a hose had been forced off a water pump, allowing water to come in through an engine fitting, thus flooding the boat. A clamp was still on the hose and the wire that secured the hose clamp to the engine had been broken so that it had been pushed down. Numerous articles of personal property were missing from the boat, including fishing gear, hand and electric tools, stove, coffee maker, and a quantity of groceries.

What caused the hose to come off the fitting is speculative. In the opinion of respondent's surveyor, it could have come off as a result of someone stepping on it. In the opinion of appellant's surveyor, the hose could have worked its way loose by vibration. The boat sank some five or six days after it had been towed from its regular moorage. The evidence showed that it would take from eight to ten hours for the boat to sink after the hose came off.

Respondent, in the joint pretrial statement asserts: "Plaintiff seeks damages for the sinking of the vessel on the theory of conversion or negligence on the part of defendant, which claim the defendant denies."

In his statement of issues and contentions, respondent in pertinent part asserts:

"ISSUES

"1. Ownership of vessel 'Rum-N-Coke'.

"2. Conversion of plaintiff's vessel 'Rum-N-Coke' by defendant.

"3. Damages suffered by plaintiff.

"4. Intent of the defendants when assuming dominion and control over plaintiff's vessel.

"5. Negligence of defendants.

"CONTENTIONS

"1. That defendant is the owner of oil screw vessel 'Rum-N-Coke'.

"2. That plaintiff leased wharfage from the defendant for the purpose of mooring his vessel.

"3. That defendants converted plaintiff's vessel 'Rum-N-Coke' and exercised exclusive dominion and control over it to the exclusion of the plaintiff.

"4. During the time that plaintiff's vessel was under the care and custody and control of the defendants, said vessel sank.

"5. That defendants exercising of dominion control over plaintiff's vessel was an act of conversion done maliciously, unlawfully and oppressively.

"6. Because of said acts of defendant, plaintiff has been damaged."

The trial commenced in chambers, apparently to amend pleadings and settle issues. In pertinent part, the following took place:

"THE COURT: Well, no. It is stipulated, as I understand it, that the Plaintiff is not going to claim negligence on the part of the Defendant; is that correct?

"MR. RAUCH: That's my understanding.

"MR. BRIGHT: That's correct.

"MR. RAUCH: So stipulated."

Respondent asked for a number of instructions regarding matters stemming from a relationship of landlord and tenant. All were refused by the court. The jury was instructed on conversion and trespass to personal property.

It is clear from the pleadings, the pre-trial statement, the statement of issues and the evidence that the action at bench is not one for damages by reason of eviction, unlawful detainer or forcible detainer. Conceding *arguendo,* appellant's wrongful removal of personal property from the slip, such removal did not prevent respondent from asserting that he was still the tenant of the slip in question. There is no evidence that there was any attempt on respondent's part to use the slip after June 17, 1965, the date upon which appellant towed the boat out of the slip, or that he was actually prevented from using it.

Assuming the soundness of respondent's theory in respect of a landlord-tenant relationship, respondent might have brought an action to regain possession of the slip or for damages under the above theories. (*Saferian* v. *Baer,* 105 Cal. App. 238, 242-243, 245 [287 P. 142].) In such a cause of action the lessee may recover as damages the value of his unexpired term and any other damage which is the natural and proximate result of the eviction. (*Stillwell Hotel Co.* v. *Anderson,* 4 Cal.2d 463, 469 [50 P.2d 441].) Thus measured, there apparently would be no damages in the present case. Although the boat was moved, respondent at no time was deprived of the use thereof, nor did he incur extra moorage charges because of the alleged ouster. Any cause of action

based upon a landlord-tenant theory would require a showing that the sinking of the boat was the natural and proximate cause of the eviction. There is no such showing.

 Conversion is defined as " 'any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein' ", *Zaslow* v. *Kroenert*, 29 Cal.2d 541, 549 [176 P.2d 1] and " [t]o establish a conversion, it is incumbent upon the plaintiff to show an intention or purpose to convert the goods and to exercise ownership over them, or to prevent the owner from taking possession of his property." (*Zaslow* v. *Kroenert, supra,* at p. 550.)

 At trial the bookkeeper for Colonial was asked, "Q: . . . He couldn't have the boat back without the payment of the rent; isn't that correct? A: Oh, no. No. No, not that. We wanted him to pay his rent; but because we wanted him to leave so badly, that for him to come down and get his boat, and we wanted him out of our landing. . . .

"Q: If on June first or June second or June third Mr. Itano had come to take his boat away, would you have charged him anything for June? A: No, sir. We would have been very glad to let him go. It had been so long."

The Secretary-Treasurer of Colonial testified ". . . If he would have come down and said, 'I'm going to move the boat' we would have said, 'Fine, take it, leave.' "

The evidence shows only that the boat was moved from one place to another in the anchorage area. There is no evidence tending to prove that Colonial intended to prevent Itano from using or removing his boat. Colonial did not use Itano's boat or make any claim of ownership to it.

 The act of removing personal property from one place to another, without an assertion of ownership or preventing the owner from exercising all rights of ownership in such personal property, is not enough to constitute a conversion. (See *Zaslow* v. *Kroenert, supra,* at p. 551; *Jordan* v. *Talbot*, 55 Cal.2d 597, 610 [12 Cal.Rptr. 488, 361 P.2d 20, 6 A.L.R.3d 161].) At bench the record shows in addition that respondent must have known the boat was going to be moved and the approximate place to which it was moved.

In *Jordan, supra,* the court held that the act of a landlord in wrongfully and forcibly entering an apartment and removing the property therein to a warehouse for storage in the owner's name did not constitute a conversion of the owner's goods.

We conclude that moving of the boat from one slip in appellant's anchorage to another with no intent to exercise ownership over it or to prevent the owner from taking possession of his property does not amount to a substantial interference with possession, but may amount to trespass to or intermeddling with the personal property of respondent.

When conduct complained of consists of intermeddling with personal property "the owner has a cause of action for trespass or case, and may recover only the actual damages suffered by reason of the impairment of the property or the loss of its use." (*Zaslow* v. *Kroenert, supra,* at p. 551; *Jordan* v. *Talbot, supra,* at p. 610.)

To recover on the theory of trespass to personal property, however, there must be substantial evidence that there was intentional interference with the possession of respondent, which interference proximately caused the damage complained of.

The jury was instructed that "A trespass to personal property is an intentional interference with the possession or physical condition of the personal property in possession of another, without justification or consent, proximately causing the damage complained of." "Proximate cause" was explained to the jury in terms of foreseeability by a person in appellant's place using ordinary care.

As pointed out above, it was stipulated at the outset of the trial that appellant was not negligent. The case was not tried on the theory of negligence. There is no evidence that appellant did not use ordinary care in tying up the boat. In fact, every indication of the evidence is that appellant did use ordinary care and was not in any way responsible for the sinking of the boat.

Appellant cannot be held liable for damages not proximately caused by its intermeddling. Dean Prosser points out that: "An essential element for plaintiff's cause of action for negligence, or for that matter for any other tort, is that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." (Prosser, Torts, (2d ed.) p. 218).

*Howard* v. *Deschambeault,* 154 Me. 383 [148 A.2d 706], on the facts is apposite to the record before us. In *Howard,* a car sank after having been moved by a parking lot attendant. Defendant parking lot owner was attempting to move plaintiff's car which was obstructing one of defendant's customer's cars on his lot. For some reason, attributed by defendant to failure of the brakes, he was unable to stop the

car and it continued over the bank into the river adjoining the parking lot. The court stated that he was not liable for conversion, but could be liable for negligence, if that issue had been raised.

*Gilman* v. *Emery,* 54 Me. 460, is also analogous. In that case a horse and wagon had been hitched to defendant's shade tree. Defendant, knowing that horses are harmful to shade trees, unhitched it and moved it to a nearby post, to which he hitched the animal. The horse subsequently broke loose and ran away, breaking the wagon as it ran. The court upheld a nonsuit, finding that the move was not a trespass, and that there was no evidence that defendant did not use ordinary care in hitching the horse. The court pointed out that it was not such an act that plaintiff would have complained about it had not the horse run away.

The record before us does not, on any theory, support the verdict or the judgment entered thereon.

The judgment is reversed with directions to enter a judgment for appellant. Costs to go to appellant.

Herndon, J., and Fleming, J., concurred.

A petition for a rehearing was denied November 29, 1968, and respondent's petition for a hearing by the Supreme Court was denied December 24, 1968. Peters, J., was of the opinion that the petition should be granted.