Filed 3/15/16  Avista Development v. Aldrich CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| AVISTA DEVELOPMENT, LLC et al., | D069076 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. CIVDS1204644) |
| MARK ALDRICH et al., | |
| Defendants and Appellants. | |

APPEALS from an order of the Superior Court of San Bernardino County, David S. Cohn, Judge.  Affirmed.

Dentons US, David Simonton, Joshua Kroot for Plaintiffs and Appellants.

Lester & Cantrell, Mark S. Lester, David Cantrell and Colin A. Northcutt for Defendants and Appellants.

The parties appeal an order granting in part a special motion to strike under Code of Civil Procedure section 425.16,[1] the anti-SLAPP (strategic lawsuit against public participation) statute.  The operative second amended complaint (SAC) filed by plaintiffs

___

1    All further statutory references are to the Code of Civil Procedure unless otherwise specified.

Avista Development, LLC (Avista), United Strategies, Inc. (United), Brownfield Group, LLC (Brownfield), Bruce Cash, and Carrie Cash (collectively, Plaintiffs), alleges five causes of action: (1) conversion; (2) trespass to chattels; (3) trespass to land; (4) nuisance; and (5) fraud. The trial court granted the anti-SLAPP motion filed by defendants Mark Aldrich, Ted Dutton, Jo Dutton, and School Facility Advisors, Inc. (collectively, Defendants) as to the fraud claim, and denied the motion as to all of the other causes of action.

The parties dispute whether Plaintiffs' causes of action arise from protected activities. Defendants contend that all of Plaintiffs' causes of action arise from communications made at a judgment debtor examination, which constitutes protected activity, and thus, that the entire SAC must be stricken under the anti-SLAPP statute. Plaintiffs maintain that their claims arise from extrajudicial and noncommunicative acts by Defendants that occurred after the judgment debtor examination, and that interfered with Plaintiffs' use of their property. We conclude that the gravamen of the first through fourth causes of action is not based on protected activity in furtherance of the Defendants' rights of petition or free speech, but that the fifth cause of action, for fraud, does arise from protected conduct, and Plaintiffs did not establish a likelihood of prevailing on the fraud claim. Accordingly, we affirm the trial court's order.

## FACTUAL AND PROCEDURAL BACKGROUND

A.      *Ted Dutton's judgment against the Cashes*

Carrie Cash and Bruce Cash[2] are the founders of United, Avista, and Brownfield, three separate companies formed in 1998, 2003, and 2005, respectively.  United is a regulatory compliance business involving land use and environmental rights.  Avista was formed to develop 156 acres of real property that it owns, located near Redlands, California.  Brownfield was formed to sell real property located in Rialto, California.  The companies' operations are run from the same office in Redlands, where Carrie and Bruce also maintain certain personal files and assets.

In 2002, following a bench trial over a disputed debt, Ted obtained a monetary judgment against Bruce and Carrie, jointly and severally.  The judgment awarded Ted $200,000, prejudgment interest, and attorney fees and costs.  The companies founded by Bruce and Carrie are not named in Ted's judgment.  During the litigation and afterward, Ted was represented by an attorney, Aldrich.

B.      *Judgment debtor's examination and Defendants' post-examination conduct*

On April 30, 2009, Aldrich took a judgment debtor's examination of Carrie in order to identify the Cashes' assets and facilitate collection of the unpaid portion of Ted's judgment.  At the conclusion of the examination, Aldrich obtained an "Order for Delivery of Property after Examination" (the Turnover Order) pursuant to section 708.205.  The Turnover Order required the "Judgment Debtor" (noted in one place as Carrie and in

---

2      For the purpose of clarity, we will refer to the individual Cashes and Duttons by their first names.

3

another as both Carrie *and* Bruce) to deliver certain assets to Ted to "be applied toward the satisfaction of the judgment." The listed assets included three horses (one owned by Carrie and two owned by Avista), 100 percent of the Cashes' membership interests in Avista, 1,000 shares of stock in United, and the balance of United's bank account.

On the day of the judgment debtor examination, Aldrich allegedly misled Carrie into believing that the Turnover Order allowed him to take direct possession of the listed assets in satisfaction of Ted's judgment, without need for delivery of the assets to a levying officer. Aldrich "misrepresented to Carrie Cash that she was legally obligated to give documents, keys, passcodes, and other items and information," to Aldrich and Ted. For example, Aldrich allegedly told Carrie that she was required to provide him with the passcodes to United's and Avista's accounting software. Further, Aldrich directed Carrie to call the bank where United's account was held so that Aldrich and Ted could close the account that day and collect the cash. In each instance, the SAC alleges that Carrie reasonably relied on Aldrich's profession and his position as a court officer, and complied with his requests.

Later that same day, Aldrich sent someone to the Cashes' residence to take possession of the three horses listed in the Turnover Order. Carrie did not know that the person was Aldrich's agent and not a levying officer. According to the SAC, the manner in which Defendants took possession of the horses violated the Turnover Order.

On May 1, 2009, Ted allegedly executed a deed transferring real property owned by Avista to School Facility Advisors, Inc., a company under his and his wife Jo's control. The SAC alleges that the Duttons had no authority to transfer Avista's property.

4

On May 3, 2009, the Cashes filed for bankruptcy, triggering an automatic stay of any collection attempts (11 U.S.C. § 362), and notified Defendants that same day of the bankruptcy filing. The SAC alleges that the Cashes still owned 100 percent of the shares of United and 100 percent of Avista and Brownfield as of the date of the bankruptcy filing.

In subsequent days and weeks, Defendants allegedly entered Plaintiffs' office and interfered with Plaintiffs' use of their property. For instance, on May 4, 2009, Carrie learned from an alarm company that Ted was attempting to change the locks to Plaintiffs' office. On that date, Ted and his agent/employee allegedly entered the office without Plaintiffs' consent and began a process of searching for and reviewing physical files, faxing hundreds of pages of documents to Aldrich, and creating an inventory of Plaintiffs' personal and real property. These activities are alleged to have continued over a period of several weeks. During the same time period, Defendants are alleged to have physically removed computers, documents, files, and personal property belonging to Plaintiffs from the office.

On May 5, 2009, Plaintiffs' counsel sent an e-mail to Aldrich stating his clients' position that Defendants were violating the automatic stay triggered by the Cashes' bankruptcy petition (11 U.S.C. § 362). The next day, Bruce and his attorney alerted the Redlands Police Department to Defendants' unauthorized entries into Plaintiffs' office, and a police officer went to the office to investigate. Aldrich, who was physically present in the office when the officer arrived, apparently justified his presence to the responding police officer by pointing to the Turnover Order. The officer declined to interpret the

5

Turnover Order, advised the parties to resolve the matter in civil court, and left the premises. Over the next few days, Defendants allegedly arranged to have United's and Avista's mail forwarded to new post office boxes, created false invoices, sent out collection letters to United's clients, and successfully collected some money from those clients. The SAC alleges that in mid-May, Ted and Aldrich closed Avista's bank account and collected all of the funds from the account.

Plaintiffs allege that Defendants' actions resulted in damages to Plaintiffs, including depriving Plaintiffs of the use of their property, reputational harm, canceled business projects, and lost profits and opportunities.

C.    *Bankruptcy court proceedings*

In early June 2009, a bankruptcy court found that the Turnover Order "did not effectuate the transfer of title to, or ownership of, any assets from [Bruce and Carrie] to [Ted]. Therefore, all assets listed in the Turnover Order became property of the Bankruptcy Estate on the petition date." The bankruptcy court ordered Ted and his agents to "immediately, and not conditioned upon entry of this Order, return possession of the offices and assets of [United] and Avista including but not limited to, computer servers and office keys to [Bruce and Carrie] . . . [who] shall possess the assets subject to the Trustee's right to administer such assets." The bankruptcy court further ordered that Ted and Aldrich deposit "all proceeds of the sale of the horses," "all other cash proceeds of the assets listed in the Turnover Order," and "all other cash generated" from operating United and Avista, into a trust account, and provide an accounting of funds to the

6

bankruptcy trustee. Finally, the bankruptcy court ordered Ted and his agents to return any and all of Plaintiffs' business records, including intellectual property.[3]

D.    *Superior court proceedings*

Plaintiffs filed their complaint in this case in May 2012. Defendants filed an anti-SLAPP motion, which was denied. In November 2013, Plaintiffs filed the SAC. In moving to strike the SAC, Defendants requested judicial notice of Ted's 2002 judgment, the Turnover Order, and several documents from the bankruptcy proceeding, such as declarations filed by the Cashes in connection with obtaining the Bankruptcy Order. Defendants also submitted a declaration from Aldrich, in which he confirms that he took Carrie's judgment debtor examination. In the declaration, Aldrich states that Carrie "voluntarily" agreed to turn over property, permit access, and transfer information, to him and Ted. Aldrich's declaration also confirms that he was present in the Cashes' office in May 2009 "to take inventory of the assets that had been surrendered voluntarily" and during the Redlands Police Department encounter.

In opposing the anti-SLAPP motion, Plaintiffs submitted two declarations from their counsel, deposition testimony from Defendants' agents, and Bruce's declaration. Plaintiffs also requested judicial notice of several documents from the bankruptcy proceeding, including Carrie's declaration and the Bankruptcy Order. The deposition testimony, which was ruled admissible, tends to show that Ted and Aldrich were physically present in Plaintiffs' office on several occasions in May 2009, that they hired

---

3    Hereinafter, we refer to the bankruptcy court's June 2009 order as the Bankruptcy Order.

7

an agent (Melinda) to search through and notate Plaintiffs' files, documents, and/or information, and that they had been making efforts to assess the value of properties owned by Plaintiffs.

With their reply brief, Defendants filed a number of objections to Plaintiffs' request for judicial notice and evidence. Notably, Defendants argued that Carrie's bankruptcy court declaration was inadmissible for the truth of the matters asserted therein and that large portions of Bruce's declaration lacked foundation, personal knowledge, and contained inadmissible hearsay. In an ex parte request, Plaintiffs sought to file a surreply and to submit additional evidence, including a declaration from Carrie. The court initially granted Plaintiffs' requests. Several days later, the court became aware that defense counsel had not been provided notice of Plaintiffs' ex parte application. In a hearing on the matter in which the court acknowledged that a "deprivation of due process" had occurred, Defendants strongly objected to the court's considering additional evidence that Plaintiffs could have presented earlier and/or that would cause further delays. Concluding that Defendants had not been prejudiced, the court decided that it would consider the surreply and accompanying evidence. However, the following day, at the hearing on Defendants' anti-SLAPP motion, the court decided to strike the surreply and any supplemental evidence. The court stated that the additional evidence was not relevant in light of its intended ruling on the anti-SLAPP motion. The court's written order also noted "procedural irregularities discussed at the hearing" as a reason for striking the evidence.

The court denied Defendants' anti-SLAPP motion on the causes of action for conversion, trespass to chattels/land, and nuisance, on the ground that the gravamen of those causes of action is not what occurred at the debtor's exam but, rather, allegedly unlawful self-help actions on the part of Defendants. In particular, the court noted that Defendants "allegedly engaged in self-help measures that went far beyond the scope of the [T]urnover [O]rder," and that they were allegedly "doing things that were not covered by the Turnover Order at all," such as "going out and grabbing . . . stuff unilaterally." As an analogy, the court explained that if a turnover order listed several cars, a judgment creditor could not "[g]rab the door" and "throw the driver out," thereby taking possession of the cars—such actions would be comparable to a "carjacking."

As to the fraud cause of action, after parsing out specific allegations that could constitute fraud, the trial court found that any alleged misrepresentations by Aldrich were made in connection with a judicial proceeding, i.e., Carrie's debtor exam. The court further found that the litigation privilege, Civil Code section 47, subdivision (b), applied to Aldrich's statements, and thus, that Plaintiffs could not prevail on their fraud cause of action. Both Plaintiffs and Defendants timely appealed.[4]

DISCUSSION

A.    *The anti-SLAPP statute*

"Review of an order granting or denying a motion to strike under section 425.16 is

---

4    The court also admitted Carrie's bankruptcy court declaration in evidence as a party admission offered by an opposing party, granted the parties' requests for judicial notice, and ruled on Defendants' evidentiary objections. To the extent necessary, Plaintiffs request that we reverse certain of the trial court's evidentiary rulings.

9

de novo." (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)
This court considers " 'the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based.' " (*Ibid.*, citing § 425.16, subd. (b)(2).) The court does not weigh or compare the evidence, but rather accepts as true the evidence favorable to the plaintiff while evaluating the defendant's evidence " 'only to determine if it has defeated that submitted by the plaintiff as a matter of law.' " (*Ibid.*)

A SLAPP suit is "a meritless suit 'filed primarily to chill the defendant's exercise of First Amendment rights.' " (*Paul v. Friedman* (2002) 95 Cal.App.4th 853, 861, quoting *Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 815, fn. 2.) A court's consideration of an anti-SLAPP motion involves a two-pronged analysis. (*In re Episcopal Church Cases* (2009) 45 Cal.4th 467, 477.) " 'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one "arising from" protected activity.' " (*Ibid.*, citing § 425.16, subd. (b)(1).) The "*principal thrust* or *gravamen*" of the claim is what governs, not individual factual allegations. (*Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 188.)

A challenged cause of action arises from activity protected by the statute when " ' "the act underlying the plaintiff's cause" or "the act which forms the basis for the plaintiff's cause of action" ' " was an act in furtherance of the defendant's right of petition or free speech. (*Kajima Engineering & Construction, Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921, 928-929.) " 'A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e).' " (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.)

10

Subdivision (e) of section 425.16 defines an " 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' [as]: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, [or] (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law[.]" (*Ibid.*; *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1113.)

If the defendant demonstrates that a cause of action falls within the anti-SLAPP statute's protection, the burden then shifts to the plaintiff to prove that he or she has a probability of prevailing on the merits. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.) The plaintiff must state and substantiate a legally sufficient claim. (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 741.) This requires the plaintiff to " ' "demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' " (*Ibid.*)

B.      *Conversion, trespass, and nuisance causes of action*

Defendants contend that the conduct that forms the basis of the first through fourth causes of action is protected under section 425.16 because it is a direct extension of protected statements made at the judgment debtor's examination. We disagree.

The gravamen of the tort of conversion is " 'the wrongful exercise of dominion over the property of another.' " (*Los Angeles Federal Credit Union v. Madatyan* (2012)

11

209 Cal.App.4th 1383, 1387.)  The gravamen of the tort of trespass is the "unlawful interference with a present possessory interest."  (*Brenner v. Haley* (1960) 185 Cal.App.2d 183, 187.)  An action for trespass to land derives from the general rule that landowners and tenants have a right to exclude persons from trespassing on private property.  (*Allred v. Harris* (1993) 14 Cal.App.4th 1386, 1390.)  Similarly, trespass to chattel is based on a defendant's intentional interference with the possession of personal property, proximately causing injury.  (*Thrifty-Tel, Inc. v. Bezenek* (1996) 46 Cal.App.4th 1559, 1566.)  Finally, nuisance cases arise from "intangible intrusions, such as noise, odor, or light" that do not cause physical damage to a plaintiff's property.  (*Wilson v. Interlake Steel Co.* (1982) 32 Cal.3d 229, 233.)

The allegations in the SAC concerning Defendants' unauthorized, repeated presence in and dominion over Plaintiffs' office, where they searched files and met with their agents, and Defendants' use, control, and removal of Plaintiffs' property, are based on conduct rather than speech, and do not implicate any act in furtherance of Defendants' constitutional rights of free speech or petition.  None of the conduct that forms the gravamen of the first through fourth causes of action constitutes a "statement" made in a "legislative, executive, or judicial proceeding," or "in connection with an issue under consideration or review by a legislative, executive, or judicial body."  (§ 425.16, subd. (e).)  Defendants argue that Plaintiffs' causes of action must be stricken under the anti-SLAPP statute because they "originate[] in and with the judgment debtor's examination."  However, a cause of action does not arise from constitutionally protected

12

activity simply because it is triggered by such activity or is filed after it occurs. (*In re Episcopal Church Cases*, *supra*, 45 Cal.4th at p. 477.)

Defendants' acts of alleged interference with Plaintiffs' property interests are not "necessarily related" to protected statements, for a number of reasons. (Cf. *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1062 (*Rusheen*) [when gravamen of a cause of action is based on a privileged communication, necessarily related noncommunicative acts are also privileged].) Principally, Defendants are alleged to have interfered with property not listed in or covered by the Turnover Order at all—e.g., property belonging to nonjudgment debtors, as well as electronic and paper files, computers, and furniture. Moreover, section 708.205 does not call for the "turn over [of] nonmonetary property directly to the judgment creditor[,]" but instead, permits a judgment debtor's interest in property "to be applied toward the satisfaction of the money judgment." (*Palacio Del Mar Homeowners Assn., Inc. v. McMahon* (2009) 174 Cal.App.4th 1386, 1390-1391 [discussing delivery of property to levying officer]; § 708.205, subd. (a) [turnover order "creates a lien on the property or debt"].) Finally, as the trial court pointed out, if Carrie or Bruce had failed to comply with the Turnover Order, Defendants could have moved for an order to show cause regarding contempt of court, rather than engaging in "self-help measures." That Defendants may possess a defense to Plaintiffs' causes of action—Carrie's consent to engage in some of the conduct complained of—does not change the

13

analysis of whether a challenged cause of action is one "arising from" protected activity.[5]

(§ 425.16, subd. (b)(1).)  The first through fourth causes of action are not based on acts in

furtherance of Defendants' protected speech.  (*Ibid.*; see *Martinez v. Metabolife Internat.,*

*Inc., supra*, 113 Cal.App.4th at p. 188.)

Section 425.16 does not apply to Plaintiffs' causes of action for conversion,

trespass to chattels/land, or nuisance.  We therefore have no need to discuss the statute's

second prong as to those causes.  The trial court properly denied Defendants' special

motion to strike the causes of action for conversion, trespass to chattels/land, or nuisance.

C.     *Fraud cause of action*

1.     *First prong of anti-SLAPP analysis*

The elements of fraud are:  (1) misrepresentation (false representation,

concealment, or nondisclosure); (2) knowledge of falsity; (3) intent to defraud, i.e., to

induce reliance; (4) justifiable reliance; and (5) resulting damage.  (*Small v. Fritz*

*Companies, Inc.* (2003) 30 Cal.4th 167, 173.)  Concealment is a species of fraud, where

" 'the defendant must have been under a duty to disclose the [concealed] fact to

plaintiff [.]' "  (*Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC* (2008)

162 Cal.App.4th 858, 868.)  "In California, fraud must be pled specifically; general and

---

5      The pleadings and evidence submitted by Defendants do not establish Carrie's
consent to Defendants' actions as a matter of law, and we do not resolve factual disputes
on a section 425.16 motion.  (*Freeman v. Schack* (2007) 154 Cal.App.4th 719, 733
["[M]erits based arguments have no place in our threshold analysis of whether plaintiffs'
causes of action arise from protected activity."].)

14

conclusory allegations do not suffice." (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645.)

The gravamen of Plaintiffs' fraud cause of action is alleged misrepresentations made by Aldrich at the judgment debtor examination or after the exam had concluded during a conversation with Carrie regarding what was required of her pursuant to the Turnover Order. Any alleged nondisclosures of information by Aldrich pertaining to this subject were communicative in nature and necessarily related to his affirmative representations. (*Rusheen, supra,* 37 Cal.4th at p. 1062; see also *Kupiec v. Am. Internat. Adjustment Co.* (1991) 235 Cal.App.3d 1326, 1333.) Aldrich's allegedly fraudulent statements thus fall squarely within the plain language of the anti-SLAPP statute. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 90.)

Plaintiffs contend that Defendants' acts of interference with Plaintiffs' property rights that form the basis of the SAC's first through fourth causes of action similarly provide the basis for their fraud claim, under a "concealment" theory. In addition to the central allegation of Aldrich's false and misleading representations, the SAC alleges that Defendants concealed or suppressed facts, such as their nonconsensual entry onto Plaintiffs' property, their "intent to disregard the levying procedure required by the turnover order," and their interferences with Plaintiffs' property. However, the SAC does not sufficiently allege Defendants' duty to disclose their purportedly concealed actions or Plaintiffs' justifiable reliance on the alleged concealments in light of information that was known or available to them. Simply put, Defendants' alleged acts of conversion, trespass, and/or nuisance do not provide a sufficient basis for Plaintiffs' claim of fraud.

15

Because Defendants have demonstrated that the fraud cause of action meets the anti-SLAPP statute's first prong, we turn to the second prong of the anti-SLAPP analysis, Plaintiffs' likelihood of prevailing on the merits of that claim.

2.      *Second prong of anti-SLAPP analysis*

Defendants offer several reasons why Plaintiffs cannot prevail on the merits of their fraud cause of action; we need address only one, which, if applicable, warrants dismissal of the fifth cause of action.  Defendants argue that Plaintiffs' fraud cause of action is barred by the litigation privilege, which applies to communications made in any "judicial proceeding."  (Civ. Code, § 47, subd. (b)(2).)  We agree.

The principal purpose of the litigation privilege "is to afford litigants and witnesses [citation] the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions."  (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 213.)  The privilege applies to any communication:  "(1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action."  (*Id.* at p. 212 [privilege can apply even when communication "is made outside the courtroom and no function of the court or its officers is involved"].)  For purposes of applying the litigation privilege, courts have recognized that collection of a judgment is a litigation objective.  (*O'Keefe v. Kompa* (2000) 84 Cal.App.4th 130, 135.)

As noted above, Plaintiffs' fraud cause of action is based on Aldrich's representations (or nondisclosures) at Carrie's judgment debtor exam.  The litigation privilege applies because Aldrich was communicating with Carrie about matters

16

connected or logically related to achieving the collection of a judgment through court proceedings. (See §§ 708.110–708.205 [discussing judgment debtor examination proceedings].) Plaintiffs have not sufficiently pleaded that Defendants' subsequent conduct—alleged interferences with Plaintiffs' property interests—constitutes a sufficient, independent basis for a cause of action for fraud. Accordingly, Plaintiffs have not demonstrated a likelihood of prevailing on their fraud cause of action, and the trial court properly struck that claim.[6]

## DISPOSITION

The order is affirmed. Each party shall bear its own costs on appeal.

AARON, J.

WE CONCUR:

McINTYRE, Acting P. J.

O'ROURKE, J.

---

[6]     In light of our decision, we have no need to address the trial court's evidentiary rulings.

17