Filed 9/12/14  Mechanics Bank v. Methven CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| MECHANICS BANK,<br><br>      Plaintiff, Cross-defendant and Respondent,<br><br>v.<br><br>BRUCE E. METHVEN et al.,<br><br>      Defendants, Cross-complainants and Appellants. | A136403, A136971<br><br>(Alameda County<br>Super. Ct. No. RG09480465) |

Attorney Bruce E. Methven (Methven) fell victim to an email scam in which a "client" soliciting his services persuaded him to accept a counterfeit cashier's check from a purported debtor, deposit that check in his account at Mechanics Bank (Bank), and wire the money overseas, where it was never to be seen again.  After learning the check was counterfeit, Bank charged back the amount of the check to Methven's account, took money from his other bank accounts to offset the resulting overdraft, and filed a civil action against Methven and his firm, Methven & Associates, to recover the balance. Methven filed a cross-action to recover the money taken by the Bank as an offset.

Following a special jury verdict, the trial court entered a judgment that effectively left the parties in the same position as they were after the scam, but before the litigation: Methven was not required to pay the remaining balance of his overdraft, and Bank

1

retained the money already seized.  We conclude Bank was entitled to recover the balance owed on the overdraft under its cause of action for breach of contract.

## I.  FACTS AND PROCEDURAL HISTORY

Methven operates his own small law office in Berkeley.  His practice includes various areas of civil law, including real estate, business, contracts, securities, trademarks and debt collections.  Methven maintained a listing in the Nolo Press lawyer directory, which is accessible on the Internet.  He had been contacted through the directory many times and had obtained clients from that resource.

On May 29, 2009, Methven received an email from a Hong Kong email address referencing the Nolo directory and stating, "We Need A Litigation Lawyer For Collection."  Methven replied, "We definitely handle collections work," and asked for more specifics.  A "Liu Chan" emailed him back on May 30 stating that over $2.8 million in delinquent accounts in the United States were owed to "Motor Electric Manufacturing Company" and offering Methven a retainer fee of $25,000.  Methven sent an email on June 4, in which he confirmed he could handle that type of work, and attached a proposed fee agreement.  Liu Chan sent Methven an image of a signed fee agreement attached to an email that stated, "There is also an urgent payment request by a customer we had informed of using your firm's services to collect our monies owed and the customer is will[ing] to make an immediate payment of $365,400.15.  Please, confirm name check is to be drawn on and mailing address.  The board has also agreed that the retainer fee be deducted from the payment upon receipt so you can start working, we are indeed very excited about this payment news."

Methven directed Liu Chan by a June 8 email to have the customer make out the check to "Methven & Associates" and advised him that after depositing the check in his client trust account he would send the money via express mail or a wire transfer.  Liu Chan sent an email on June 9 advising Methven the check had been mailed.  On June 10, Methven received what appeared to be a Citibank cashier's check in the amount of $362,400.25, accompanied by a one-page invoice from "Motor Electric Manufacturing

2

Company Ltd" in Hong Kong for equipment supplied to "Bruderer Machinery Inc." in Ridgefield, New Jersey. The check indicated the "remiter" was Bruderer Machinery Inc., and the overnight delivery envelope in which it arrived had been sent from Ontario, Canada, from someone identified as "Pat Savage."

Methven was a longtime customer of Bank, where he maintained an Interest on Lawyers' Trust Account (IOLTA),[1] along with other personal accounts. On the day Methven received the check, his office manager Abe Flores took it to Bank and deposited it into Methven's IOLTA, which had a balance of $67,948.08 prior to the deposit.

Fatima Factora, a bank supervisor, accepted the deposit at the teller window after a brief examination of the check. She did not place a "hold" on the check due to Methven's long-standing relationship with Bank, though in taking the deposit she was not making a determination the check was valid. Bank's policy was to make funds from a deposit available the following day so long as no hold was placed, and a teller decides whether to place a hold based on the standing of the customer who deposits it, the amount of the check, and the balance in the customer's account.

Although Methven had asked Flores to find out how long it would take for the check to "clear," Flores had forgotten to ask Factora this question. After he returned to Methven's office, Flores called Bank and spoke to office manager Thuy Nguyen. According to Flores, he asked Nguyen whether the check would clear and mentioned they needed to make a wire transfer. Nguyen said she was looking at the check and it would clear right away. Flores asked whether it mattered that the check was over $300,000 and from a different bank and Nguyen confirmed it would clear. They also discussed a hold on the check, but Flores did not recall the details of what was said. When he finished his conversation with Nguyen, Flores told Methven the check would clear right away.

According to Nguyen, Flores asked her whether a "hold" had been placed on the check he had just deposited (i.e., were the funds available for use?), not whether the

---

[1] Business and Professions Code section 6211 authorizes the pooling of nominal, short-term client deposits to generate interest income for indigent legal services funding. (*Carroll v. State Bar* (1985) 166 Cal.App.3d 1193, 1198-1199.)

3

check had "cleared" (i.e., had the funds been collected from Citibank?). She spoke briefly with Factora, who told her no hold had been placed on the check, and she advised Flores of the same. Nguyen would not have told Flores the check had cleared if he had asked that question because she knew the check had not left the Bank and it was not possible for the check to have cleared yet.

Methven emailed Liu Chan the same day (June 10) to tell him the check had been deposited and to obtain instructions for sending the money. Liu Chan directed Methven to wire $269,401 to a company in Tokyo, Japan, via its Japanese bank account and deduct his $25,000 retainer fee. Bank faxed Methven a wire transfer request form, and Methven filled it out the following morning (June 11) and faxed it back to Bank.

Methven telephoned Bank after faxing back the wire transfer form and spoke to employee Ioannis Rallis. According to Methven, he told Rallis he had deposited a check the previous day and wanted to confirm there were no problems with the check before sending the wire; Rallis told Methven the money was in the account. According to Rallis, Methven did not discuss the deposit or the money in his account, and their conversation was limited to the information necessary for effecting the wire transfer. Under Bank's internal policy, uncollected funds, or funds the bank has not had time to collect, cannot be used to fund a wire transfer.

After the first wire transfer was made and Methven emailed the confirmation to Liu Chan, Liu Chan emailed Methven and instructed him to wire $67,999.25 to a different Japanese bank account for "UC Auto Parts." Methven authorized the second transfer, which was sent on June 12, and emailed Liu Chan the confirmation.

On June 15, the cashier's check was returned to Bank by Citibank, unpaid, because it was counterfeit. Bank charged back the amount of the cashier's check to Methven's IOLTA account, which resulted in an overdraft of $269,458.17. It attempted to recover the money that had been wired to the banks in Japan, but was not successful. After asking Methven to cure the overdraft, Bank took funds totaling $161,896.18 from his other accounts as a setoff, leaving a $107,606.96 overdraft in the IOLTA account.

4

After Methven refused Bank's demands that he pay the $107,606.96 overdraft, Bank filed a civil complaint seeking that amount in damages. The complaint contained causes of action for breach of warranty under California Uniform Commercial Code (CUCC) section 4207,[2] based on Methven's presentation of a counterfeit check for deposit, and breach of contract, based on his failure to repay the overdraft amount as required by the deposit agreement governing his accounts.

Methven filed a cross-action against Bank. After a demurrer to his first amended cross-complaint was sustained with leave to amend, he filed a second amended cross-complaint that asserted causes of action for negligence, negligent misrepresentation, conversion, breach of contract, breach of the implied covenant of good faith and fair dealing, estoppel, and unfair business practices. The second amended cross-complaint alleged Bank knew or should have known the check was counterfeit when it was presented for deposit, knew or should have known of similar scams, had a duty to place a hold on the funds, and should not have advised Methven he could use the funds. Bank filed a demurrer on the ground the claims were inconsistent with the CUCC, and the court sustained the demurrer without leave to amend as to the causes of action for negligence, breach of contract, and breach of the implied covenant of good faith and fair dealing. The demurrer was overruled as to the common law claims of negligent misrepresentation, estoppel and unfair business practices.

The case proceeded to a jury trial. Bank presented evidence that when Methven opened the IOLTA account, he signed a signature card incorporating the terms of an account agreement. That agreement set forth a bank policy of making funds from deposits available to customers on the day after the deposit, with the caveat that a customer was responsible for deposited checks that were returned as unpaid. If an item deposited was returned unpaid, the amount of that item would be charged back to the account, and in the case of an overdraft, the customer was required to pay even if the funds had already been used.

---

[2] Further statutory references are to the California Uniform Commercial Code unless otherwise indicated.

5

The jury was instructed on Bank's claims for breach of warranty and breach of contract and Methven's claims for negligent misrepresentation and conversion. At the parties' request, the court allowed each side to amend its pleadings to include a common count for money had and received, and gave instructions on that theory. Special verdict forms were supplied as to each cause of action.

As to Bank's claim for breach of warranty, the jury found Methven had breached a warranty in presenting the cashier's check for deposit, but that Bank could not recover as it had not acted in good faith in connection with the check. As to the breach of contract claim, the jury found Methven had breached his contract with Bank, causing damages of $107,561.99, but Bank could have avoided the full amount of damages with reasonable efforts or expenditures. On Bank's alternative cause of action for money had and received, the jury found Methven had received $107,561.99 from Bank, had used it for his own benefit, and had not given it back to Bank.

On Methven's claim for negligent misrepresentation, the jury found Bank employees Nguyen and Rallis had made false factual representations, but that those employees had reasonable grounds for believing the representations to be true. On the conversion claim, the jury found Bank had interfered with bank account funds that Methven had the right to control, and set the amount of damages at $68,000. On Methven's claim for money had and received, the jury determined Bank had received $229,844.26 from Methven, had used it for its own benefit, and had not given it back to Methven.

Following the verdict, the court held a bench trial on Methven's equitable causes of action for estoppel and unfair business practices, and whether Bank should be precluded from any recovery based on the equitable defense of unclean hands. It requested that the parties file proposed judgments in light of the jury's apparently contradictory special verdict findings.

After taking the case under submission, the court issued a judgment rejecting Methven's equitable claims and awarding damages to neither side. As to the theory of money had and received, under which the jury found Methven owed Bank $107,561.99

6

and Bank owed Methven $229,844.26, the court concluded an award was not proper when the parties' relationship was governed by a written contract. As to the jury's finding Bank had converted $68,000, that determination was inconsistent with the CUCC, which specifically allows a bank to set off or charge back an account to cover an overdraft.

The court denied Bank's motions for new trial and judgment notwithstanding the verdict. Because Bank had initiated the action, it awarded Methven's costs, though it denied his motion for contractual attorney fees and expert costs, finding neither side had prevailed.

Both sides appeal.

## II. DISCUSSION

### A. *Overview—CUCC and Common Law*

The causes of action in this case arise from Methven's deposit of the counterfeit check, Bank's acceptance of that check, the communications between Methven and Bank regarding the availability of funds, the wire transfers, Bank's chargeback to Methven's IOLTA account, and its use of funds in his other accounts to offset the overdraft. Aspects of these transactions are governed by the CUCC. We give a brief overview of the CUCC provisions relevant to the transactions, as this overview is useful to understanding the trial and the theories presented.

Bank deposits of negotiable instruments are governed by Divisions 3 and 4 of the CUCC. (*Holcomb v. Wells Fargo Bank, N.A.* (2007) 155 Cal.App.4th 490, 497 (*Holcomb*).) " 'When a customer deposits a check drawn on another bank, the customer receives a provisional credit for the amount of the check. [Citations.] [Fn. omitted.] The collecting bank, acting as the customer's agent, then forwards the check to the payor bank or a presenting bank which gives the collecting bank a provisional credit. [Citation.] If the check is forwarded to a presenting bank, the presenting bank in turn presents the check to the payor bank from which the check is to be drawn and receives a provisional credit. If the payor bank does not promptly dishonor the check, the provisional

7

settlements throughout this chain of banks become final.' [Citation.] Until final settlement for an item is made, 'any settlement given for the item is provisional.' (§ 4201.)" (*Ibid.*)

Section 4214 allows a bank to charge back an item to a customer's account under the following circumstances: "If a collecting bank has made provisional settlement with its customer for an item and fails by reason of dishonor, suspension of payments by a bank, or otherwise to receive settlement for the item which is or becomes final, the bank may revoke the settlement given by it, charge back the amount of any credit given for the item to its customer's account, or obtain refund from its customer, whether or not it is able to return the item . . . ." (§ 4214, subd. (a).) A collecting bank's right to charge back is not affected by the customer's previous use of the provisional credit given or a bank's failure to exercise ordinary care. (§ 4214, subds. (d)(1) & (2).) However, a customer has an offsetting right to recover damages against a bank for harm stemming from a bank's negligence in handling an item. (§ 4214, subd. (a); *Wells Fargo Bank, N.A. v. FSI, Financial Solutions, Inc.* (2011) 196 Cal.App.4th 1559, 1571 (*FSI*).)

Wire transfers are governed by Division 11 of the CUCC, which includes specific provisions regarding the liability of a bank receiving a transfer order. (*Chino Commercial Bank, N.A. v. Peters* (2010) 190 Cal.App.4th 1163, 1173-1174 (*Chino*).) Although the CUCC addresses unauthorized wire transfers, erroneous wire transfers, amended and canceled wire transfers, and erroneously executed wire transfers, "nothing [in the CUCC] makes a receiving bank liable for its negligence in accepting a duly authorized and error-free wire transfer." (*Id*. at p. 1174.)

The CUCC "expressly displaces common law, to the extent that its 'particular provisions' apply." (*Chino*, *supra*, 190 Cal.App.4th at p. 1170; § 1103, subd. (b).) The CUCC does not preempt a common law claim for negligent misrepresentation based on a customer's detrimental reliance upon a bank employee's incorrect statements in connection with a deposit. (*Holcomb*, *supra*, 155 Cal.App.4th at p. 498.)

A bank may seek recovery of an overdraft on a breach of contract theory based on the terms of a written account agreement. (*Chino*, *supra*, 190 Cal.App.4th at p. 1170.)

8

## B. *Conversion Claim (Methven)*

The court declined to enter judgment on the jury's special verdict that Bank had converted $68,000, because it determined a common law claim for conversion was preempted by the chargeback rights held by Bank under the CUCC. Methven argues this was error because (1) chargeback rights do not apply to an IOLTA trust account and (2) Bank was liable for its own negligence in handling "an item." We disagree.

The order we are considering was essentially a judgment notwithstanding the verdict on the court's own motion. (Code Civ. Proc., § 629.) The parties agree the issue presented involves the application of statutory language to undisputed facts, and is a question of law we review de novo. (See *Gunnell v. Metrocolor Laboratories, Inc.* (2001) 92 Cal.App.4th 710, 718-719; *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 284.)

The $68,000 awarded by the jury on the conversion cause of action represents the approximate amount of money in Methven's IOLTA account attributable to his other clients just before the chargeback.[3] This means the conversion was predicated on Bank's chargeback of the IOLTA account after learning the cashier's check was fraudulent. The CUCC expressly authorizes a bank to charge back an item to a customer's account when Bank has granted a provisional credit for the item and it is subsequently dishonored. (§ 4214, subd. (a).) When the CUCC applies to a transaction, it "expressly displaces common law, to the extent that its 'particular provisions' apply." (*Chino*, *supra*, 190 Cal.App.4th at p. 1170; § 1103, subd. (b).) Section 4214, subdivision (b) renders a common law claim of conversion untenable when it is based on a chargeback for a check that has been dishonored.

---

[3] On June 10, 2009, Methven deposited the $362,400.25 counterfeit cashier's check into the IOLTA account. He made wire transfers of $269,401.00 and $67,999.25 on June 11 and 12, which together represented the amount of the cashier's check less Methven's $25,000 "retainer fee." The balance of the IOLTA account after the transfers, but before Bank reversed the credit, was $92,948.08, reflecting $25,000 for the purported retainer and $67,948.08 of additional funds.

9

Methven argues section 4214, subdivision (b) does not allow a chargeback to an IOLTA, in which an attorney holds clients' money in trust. He cites two decisions setting forth the following rule: "[W]hen the funds are trust funds and the bank knows or has knowledge of facts sufficient to put it on inquiry that the funds are held by the depositor in trust, the bank may not, as against the beneficiary, apply those funds to the depositor's individual indebtedness to the bank." (*Chang v. Redding Bank of Commerce* (1994) 29 Cal.App.4th 673, 682 (*Chang*); *Chazen v. Centennial Bank* (1998) 61 Cal.App.4th 532, 541-542 (*Chazen*).) These cases are distinguishable.

In *Chang*, a developer paid funds to its general contractor for the sole purpose of paying subcontractors on a project. (*Chang*, *supra*, 29 Cal.App.4th at p. 677.) The contractor put those funds in its business account, and his bank seized the money to set off amounts owed to that bank as the result of the contractor's default on a loan agreement. (*Id*. at pp. 677-678.) The developer paid the subcontractors' liens and pursued an equitable subrogation action against the contractor's bank, with causes of action for unjust enrichment and imposition of a constructive trust. (*Id*. at p. 679.) The court held the contractor had been holding the money in trust for the subcontractor-beneficiaries, and the bank was not entitled to use that money to set off the contractor's debt if it had notice of that relationship. (*Id*. at p. 685.)

In *Chazen*, the plaintiffs alleged they had been defrauded by a loan broker who agreed to service loans they had made by collecting the payments and remitting them to plaintiffs. (*Chazen*, *supra*, 61 Cal.App.4th at p. 536.) The broker opened accounts at the defendant bank for this purpose, but converted large portions of the payments made for his own use. (*Ibid*.) Though the court rejected the argument the bank had a duty to monitor the illegal transfers of funds by the broker, it concluded the plaintiffs had stated a cause of action for conversion under the theory the bank had made charges against the trust accounts for obligations the broker personally owed to the bank. (*Id*. at pp. 540-541.)

Neither *Chang* nor *Chazen* considered the CUCC's preemption of a common law claim, nor do they arise from chargebacks to an account based on a dishonored check.

10

Rather, they involve situations in which a bank took money from a trust or fiduciary account to satisfy an unrelated personal debt owed by the trustee or fiduciary, and was then sued by the third party who was actually entitled to the funds. "It is axiomatic that language in a judicial opinion is to be understood in accordance with the facts and issues before the court. An opinion is not authority for propositions not considered." (*Chevron U.S.A., Inc. v. Workers' Comp. Appeals Bd.* (1999) 19 Cal.4th 1182, 1195.)

Methven contends that assuming the CUCC governs the chargeback of the IOLTA account, he is entitled to recover under his conversion claim because Bank remains liable for its own negligence under section 4214, subdivision (d)(2): "The right to charge back is not affected by either of the following: [¶] . . . [¶] . . . Failure by any bank to exercise ordinary care with respect to the item, but a bank so failing remains liable." Methven suggests Bank remains "liable" for conversion because it did not exercise ordinary care in handling the check, as evidenced by the jury's finding Bank did not act in good faith in connection with the breach of warranty claim.

Putting aside the difference between a lack of good faith and the lack of ordinary care, a bank's duty of ordinary care with respect to a check deposit is controlled by the CUCC: "(a) A collecting bank shall exercise ordinary care in all of the following: [¶] (1) Presenting an item or sending it for presentment. [¶] (2) Sending notice of dishonor or nonpayment or returning an item other than a documentary draft to the bank's transferor after learning that the item has not been paid or accepted, as the case may be. [¶] (3) Settling for an item when the bank receives final settlement. [¶] (4) Notifying its transferor of any loss or delay in transit within a reasonable time after discovery thereof. [¶] (b) A collecting bank exercises ordinary care under subdivision (a) by taking proper action before its midnight deadline following receipt of an item, notice, or settlement." (§ 4202, subds. (a) & (b).) Additionally, "[i]f the return or notice is delayed beyond the bank's midnight deadline or a longer reasonable time after it learns the facts, the bank may revoke the settlement, charge back the credit, or obtain refund from its customer, but it is liable for any loss resulting from the delay." (§ 4214, subd. (a).)

No evidence was presented to suggest Bank breached its duty of ordinary care in presenting the counterfeit cashier's check for payment or notifying Methven it had been returned; rather, Methven's claim of negligence focuses on Bank's decision to accept the check for deposit without placing a hold on the funds. This is not a basis for a negligence claim under the CUCC, which "displaces common law duties for a collecting bank." (*Dixon, Laukitis and Downing, P.C. v. Busey Bank* (Ill.App. 2013) 993 N.E.2d 580, 586 [bank not liable for negligence in accepting a counterfeit check for deposit because under Illinois version of Uniform Commercial Code "a collecting bank exercises ordinary care when it presents an item, sends notice of dishonor, finally settles an item, or timely notifies the transferor of any delay by performing such actions before midnight following receipt, notice or settlement of an item"]; *Greenberg, Trager & Herbst LLP v. HSBC Bank USA* (N.Y.App.Div. 2011) 958 N.E.2d 77, 86 [Uniform Commercial Code allocates risk of loss to customer who accepts a counterfeit check, not Bank that gives provisional credit for it].)

Even if we assume Bank could be liable to Methven under the CUCC for failing to detect the counterfeit nature of the check (see *Chino*, *supra*, 190 Cal.App.4th at p. 1172 [suggesting bank could be liable for failing to exercise ordinary care in accepting counterfeit check for deposit]), such negligence does not establish a conversion in charging back the account. " 'Conversion is the wrongful exercise of dominion over the property of another' " and "requires a showing of ownership or right to possession of the property at the time of the conversion, the defendant's conversion by a wrongful act or disposition of property rights, and resulting damages." (*Avidor v. Sutter's Place, Inc.* (2013) 212 Cal.App.4th 1439, 1452 (*Avidor*).) Bank had the statutory right to charge back the amount of the counterfeit cashier's check, even if failed to exercise ordinary care with respect to that item. (*FSI*, *supra*, 196 Cal.App.4th at p. 1570.) In light of this statutory right, Bank's action was not "wrongful" for purposes of conversion even if it was otherwise liable for damages due to its own negligence.

Finally, we agree with Bank that apart from the CUCC, the evidence did not support a claim of conversion, which requires proof of the plaintiff's ownership or right

12

to possession of the property at the time of conversion. (*Avidor*, *supra*, 212 Cal.App.4th at p. 1452.) Because the settlement of the cashier's check never became final, the chargeback to the account "was in fact only a revocation of the provisional settlement and not the deprivation of personal property of [the customer]." (*Symonds v. Mercury Savings & Loan Assn.* (1990) 225 Cal.App.3d 1458, 1468 [customer could not maintain a cause of action for conversion based on chargeback for returned check, even if bank was liable under the CUCC for negligence in presenting check for payment]; see *Bromberg v. Bank of America* (1943) 58 Cal.App.2d 1, 6-8 [bank's motion for summary judgment properly granted on conversion claim based on setoffs for an account overdraft that were permitted by statute].)

### C. *Common Count for Money Had and Received (Methven)*

Methven argues the trial court should have entered judgment on the jury's special verdict of $229,844.26 on his common count for money had and received, an amount that reflects the $67,948.08 of client funds in the IOLTA that were charged back plus the $161,896.18 taken as an offset from his other accounts. He contends the court erroneously believed the verdict on the common count was unenforceable due to its inconsistency with the jury's finding the parties' relationship was governed by contract. As with his challenge to the court's failure to enter judgment on the conversion claim, we construe the court's order as a judgment notwithstanding the verdict and apply a de novo standard of review to the legal questions presented. (*Trujillo*, *supra*, 63 Cal.App.4th at pp. 284-285; see *Singh v. Southland Stone, USA, Inc.* (2010) 186 Cal.App.4th 338, 358 (*Singh*) [special verdict reviewed de novo to determine whether findings inconsistent].)

To prevail on a common count for money had and received, the plaintiff must prove the defendant is indebted to the plaintiff for money the defendant received for the use and benefit of the plaintiff. (*Rutherford Holdings, LLC v. Plaza del Rey* (2014) 223 Cal.App.4th 221, 230.) Although case law has said a common count ordinarily cannot be used in an action on an express contract, " '[i]t makes no difference in such a case that the proof shows the original transaction to be an express contract, a contract implied in

13

fact, or a quasi-contract.' " (*Utility Audit Co., Inc. v. City of Los Angeles* (2003) 112 Cal.App.4th 950, 958.) But, when an express contract governs the parties' relationship, a common count may not be predicated on an implied contract that contradicts the terms of the express contract. (*California Medical Assn., Inc. v. Aetna U.S. Healthcare of California* (2001) 94 Cal.App.4th 151, 172 (*California Medical*); *Shvarts v. Budget Group, Inc.* (2000) 81 Cal.App.4th 1153, 1160.) "When parties have an actual contract covering a subject, a court cannot—not even under the guise of equity jurisprudence— substitute the court's own concepts of fairness regarding that subject in place of the parties' own contract." (*California Medical*, at p. 172.)

In this case, Bank sought to recover $107,561.99 from Methven based on his breach of the written account agreement in failing to repay the overdraft. The jury, in its special verdict on Methven's breach of contract claim, found Methven and Bank had entered into a contract, Methven had breached that contract, and Bank had been damaged in the amount of $107,561.99, but Bank could have avoided the full amount of these damages with reasonable efforts or expenditures. The jury also found Bank was owed $107,561.99 on its common count against Methven, in a special verdict form that did not ask the jury to determine whether Methven could have avoided the damages with reasonable efforts or expenditures.

The verdict on Methven's common count against Bank, which effectively required Bank to return the chargeback and setoff, were contrary to the terms of the express contract requiring Methven to repay the overdraft. And, to the extent the damages on the common count were based on the amount charged back to the IOLTA, they would also be preempted by the CUCC for the reasons discussed in the previous section.

Methven argues the evidence was insufficient to prove that any written contract between himself and Bank governed their relationship. We disagree. As Bank observes, it introduced signature cards for Methven's IOLTA and a checking account, both of which were signed by him on September 21, 2006, as well as signature cards signed by him for other accounts in 1997 and 2004. Those cards stated, "By signing below, you authorize The Mechanics Bank to open your account(s) above and you acknowledge

14

receipt of the applicable agreements and disclosures for your account(s)." It is well-established that a signature card such as those signed by Methven serves as a contract between the customer and the bank handling the account. (*Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 922-924, and cases cited therein.)

Bank also introduced a copy of its standard account agreement operative on September 1, 2007, and printer's proof of an earlier version of the account agreement. Rauly Butler, a senior vice-president of Bank, identified these documents and testified Bank would notify its customers of updates to the account agreements. Methven acknowledged during cross-examination that he had produced the September 1, 2007, version of the account agreement during discovery—evidence he had in fact received notice of the version of the account agreement presented by Bank. The jury could reasonably infer Methven had agreed to the terms of the September 1, 2007, account agreement, which was operative at the time of the transactions leading to this lawsuit.

Methven argues this evidence cannot be credited because Butler gave "false" testimony that the printer's proof of the account agreement was identical to the version dated September 1, 2007, even though it was not. Butler later admitted he was in error, but this does not mean that as a matter of law, there was no evidence of the relevant terms of the parties' written agreement. Though there were some variations in the versions of account agreement presented, the relevant language regarding chargebacks and setoffs was substantially the same.[4] Methven had the opportunity to argue Butler was not a credible witness and Bank had not proved the existence of a written contract, but the jury rejected that argument and determined the account agreement submitted by Bank did, indeed, amount to an enforceable contract.

---

[4] There were minor variations. For example, in the section regarding overdrafts, the printer's proof stated, "If we permit an overdraft, you agree to pay the amount of the overdraft immediately, without notice or demand from us." The September 1, 2007, version stated, "If we permit an overdraft or otherwise allow your account balance to drop below zero, you agree to pay the amount of the overdraft promptly, without notice or demand from us."

Our conclusion that the verdict on the common count conflicts with the express contract as determined by the jury disposes of Methven's contention the trial court erred in failing to enter judgment on the jury's special verdict. We also note the special verdict in favor of Methven on the common count was also inconsistent with the special verdict on Bank's common count against Methven, under which the jury awarded Bank $107,561.99 for the outstanding balance on the overdraft.[5] Both the $229,844.26 the jury found owing to Methven and the $107,561.99 the jury found owing to Bank were based on the same overdraft; as a matter of logic as well as the law, both parties could not be liable for the deficit in Methven's account under a contractually based money-had-and-received theory. " ' " 'Where the findings are contradictory on material issues, and the correct determination of such issues is necessary to sustain the judgment, the inconsistency is reversible error.' " [Citations.]' " (*Singh*, *supra*, 186 Cal.App.4th at p. 358.)

### D. *Unfair Competition Claim*

Methven argues the trial court erred when it ruled he had failed to prove Bank violated Business and Professions Code section 17200, which outlaws "any unlawful, unfair or fraudulent business act or practice." He suggests the jury's special verdict on the conversion claim shows the Bank's chargeback of the IOLTA was unlawful. Methven also claims the evidence established a "fraudulent" act or practice, because statements by Bank employees about the status of his deposit and the availability of funds were likely to mislead consumers. We disagree.

When, as here, the party with the burden of proof argues the evidence compelled a finding in his or her favor, our task as a reviewing court is to determine whether the evidence compels such a finding as a matter of law. (*Valero v. Board of Retirement of Tulare County Employees' Assn.* (2012) 205 Cal.App.4th 960, 966.) " 'Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial

---

[5] Bank does not argue the trial court erred in failing to enter judgment in its favor under its common count against Methven.

16

determination that it was insufficient to support a finding." ' " (*Ibid*., citing *Roesch v. De Mota* (1944) 24 Cal.2d 563, 571; see *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466 (*Sonic Manufacturing*).)

The evidence in this case did not compel a verdict in favor of Methven on the unfair practices claim as a matter of law. To the extent this cause of action was based on Bank's alleged conversion of the funds in the IOLTA account, we have already determined the chargeback forming the basis of the claim was authorized by the CUCC and did not amount to a conversion. "Specific legislation may limit the judiciary's power to declare conduct unfair. If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination." (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 182.)

To the extent Methven's unfair competition claim was based on "fraud" by bank employees, the evidence did not compel a verdict in his favor as a matter of law. Whether a practice is deceptive or fraudulent is "one question of fact, requiring consideration and weighing of evidence from both sides before it can be resolved." (*McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1472.) Though the jury found Nguyen and Rallis had made false representations of fact regarding the status of the cashier's check and the funds in the IOLTA, it also found those employees had reasonable grounds for believing the false representations were true. This did not amount to a fraudulent practice as a matter of law.

### E. *Attorney Fees and Expert Costs (Methven)*

Methven argues he was entitled to contractual attorney fees and expert witness expenses under a paragraph of the account agreement that provides: "Indemnification. Except as otherwise set forth in this agreement, you agree to indemnify, defend and hold us harmless from all claims, actions, proceedings, fines, costs and expenses (including, without limitation, attorney fees) related to or arising out of: (a) your actions and omissions in connection with your accounts or our services, and (b) our actions and

17

omissions, provided that they are taken/omitted in accordance with this Agreement or your instructions." He reasons that while neither side received any monetary recovery on its claims, he prevailed on Bank's cause of action for breach of contract and was entitled to fees as a party prevailing under the contract pursuant to Civil Code section 1717.

The language on which Methven relies is a standard indemnity clause requiring the indemnitor to reimburse the indemnitee for damages the indemnitee becomes obligated to pay to third parties. It is not a provision requiring prevailing party fees in an action on the contract, as would be required to trigger Civil Code section 1717. (*Carr Business Enterprises, Inc. v. City of Chowchilla* (2008) 166 Cal.App.4th 14, 19-23.) Moreover, as we explain below, we are reversing the judgment in Methven's favor on the breach of contract claim and ordering that judgment instead be entered for Bank. Methven is no longer a prevailing party on the contract.

## F. *Breach of Warranty Claim (Bank)*

Bank argues the court should have granted its motion for judgment notwithstanding the verdict and entered judgment in its favor on its breach of warranty claim against Methven because the evidence did not support the jury's conclusion Bank did not act in good faith. We disagree.

Initially, the parties dispute the appropriate standard of appellate review. Bank characterizes good faith as a defense on which Methven bore the burden of proof and urges us to review the record for substantial evidence: " ' " 'The scope of appellate review of a trial court's denial of a motion for judgment notwithstanding the verdict is to determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's conclusion and where so found, to uphold the trial court's denial of the motion.' " [Citation.]' " (*Dell'Oca v. Bank of New York Trust Co., N.A.* (2008) 159 Cal.App.4th 531, 554-555.) Methven responds that Bank bore the burden of proving good faith as a condition to recovering on a breach of warranty theory, so we should instead inquire whether Bank's evidence of good faith was " '(1) "uncontradicted and unimpeached' and (2) "of such a character and weight as to leave no room for a judicial

18

determination that it was insufficient to support a finding." ' " (*Sonic Manufacturing*, *supra*, 196 Cal.App.4th at p. 466.)  We do not need to resolve the issue because we conclude under either standard the judgment on the breach of warranty cause of action must be affirmed.

A customer who presents an item for deposit warrants the signatures on the item are authentic and authorized and the item has not been altered.  (§ 4207, subds. (a)(2) & (3).)  If that item is dishonored, a customer who has received a settlement or other consideration is obliged to pay the amount due on the item if the bank accepted that item "in good faith."  (§ 4207, subds. (b) & (c).)  The CUCC defines "good faith" as "honesty in fact and the observance of reasonable commercial standards of fair dealing."  (§ 1201, subd. (b)(20).)  Negligence does not itself defeat good faith.  (*Chino*, *supra*, 190 Cal.App.4th at pp. 1174-1175.)

In support of his claim Bank did not act in good faith in accepting the counterfeit cashier's check for deposit, Methven presented the expert testimony of Burton McCullough, an attorney with experience in banking litigation, who was familiar with the type of scam that led to this case.  McCullough explained that Bank tellers are trained to look for various signs of a counterfeit cashier's check, including misspellings on the check (such as the use of the word "remiter" in the check at issue) and the correct formatting of the fraction in the right hand corner of the check (which should match the routing number but without the zeroes).  McCullough also testified that misalignment of the signature line and different names for the drawer and payor were signs of a counterfeit cashier's check.  The check in this case bore these indicia of a counterfeit check.

Bank's operating policies and procedures manual (OPPM) advises its employees "[c]ashier's checks should be examined carefully for potentially counterfeit items" and explained the deposit of such checks created a number of risks for both the customer and the bank.  The OPPM listed physical clues such as misspellings and the formatting of fractions and routing numbers.  Factora, the teller who took the check, testified she glanced at it only briefly despite its being in excess of $360,000, and did not notice any

signs the check was counterfeit. She accepted the check for deposit and did not place a hold on the funds, based on Methven's preexisting relationship with Bank. She acknowledged she probably would have placed a hold on the check had she noticed "remiter" was misspelled, and further acknowledged the deposit of a large check ($5,000 or more) was a factor in determining whether to place a hold on a check.

Bank argues that while this evidence might have established it was negligent in accepting the counterfeit check for deposit, it does not support a determination it failed to act in good faith. We disagree. "Good faith," as defined in the CUCC, has both a subjective component (honesty in fact) and an objective component (observance of reasonable commercial standards of fair dealing). (*Choice Escrow & Land Title, LLC v. BancorpSouth Bank* (8th Cir. 2014) 754 F.3d 611, 622.) The requirement that a party adhere to objectively reasonable commercial standards of fair dealing is designed to protect the reasonable expectations of the parties. (*Id*. at pp. 622-623.)

Though the evidence does not suggest Factora or Bank was subjectively dishonest in accepting the check, the jury could conclude she failed to follow reasonable commercial standards of fair dealing when she failed to place a hold on a cashier's check that bore objective indicia of counterfeiting and that greatly exceeded the amount of existing funds in the customer's account. (*Gerber & Gerber, P.C. v. Regions Bank* (Ga.App. 2004) 596 S.E.2d 174, 178 ["fairness" standard of good faith under CUCC is question of fact]; see *Peak-Las Positas Partners v. Bollag* (2009) 172 Cal.App.4th 101, 106 [good faith and objective reasonableness under contract are questions of fact].)

Bank argues a judgment in its favor is required by *Wachovia Bank, N.A. v. Federal Reserve Bank of Richmond* (4th Cir. 2003) 338 F.3d 318 (*Wachovia*), in which a $563,288.95 check issued by Wal-Mart to a vendor was stolen and altered to name a different payee. (*Id*. at p. 320.) That payee deposited the check in his own account at Asia Bank, which presented it to the Federal Reserve Bank (FRB), which in turn presented the check to Wachovia, which issued payment. (*Ibid*.) Before the fraud was detected, the payee wired the funds from the check to foreign accounts. (*Id*. at pp. 320-321.) Wachovia unsuccessfully sought to recover its payment to Asia Bank and then

brought suit against the FRB for breach of presentment and transfer warranties under the Uniform Commercial Code (as adopted by North Carolina). (*Id.* at p. 321.)

As relevant here, the FRB asserted Wachovia could not recover under North Carolina's version of Uniform Commercial Code section 4-208, which provides that a presenting bank warrants a check "at the time of presentment" and authorizes recovery by a bank that paid the check in good faith. (*Wachovia*, *supra*, 338 F.3d at p. 321.) The court of appeals affirmed an order granting summary judgment in Wachovia's favor, concluding the FRB had presented no evidence Wachovia did not act in good faith when the check was presented to it. (*Id.* at pp. 321-322.) The court framed the relevant inquiry as whether Wachovia "acted in an unfair or dishonest manner, rather than in a negligent manner." (*Id.* at p. 323.)

The decision in *Wachovia* is distinguishable, because in that case there was no evidence the bank had violated any reasonable commercial standard of fair dealing. Although it had not examined the check manually before paying it, Wachovia had used a fraud detection service known as "Positive Pay," which verifies check numbers and amounts by comparing them to checks issued by the drawer. (*Wachovia*, *supra*, 338 F.3d at p. 320.) Wachovia's failure to examine the check manually did not show a lack of good faith because a bank was permitted to process a check by automated means so long as the practice did not violate the bank's prescribed procedures or vary from general banking practices (*Id.* at p. 323 & fn. 5.)

In this case, the jury could have found Factora's decision to accept the check without examination and without placing a hold on it was contrary to Bank's own practices, which are designed to protect both Bank and its customers from the effects of fraud. Methven was not one of the nation's largest corporations, for whom a large check might not be remarkable, but a sole practitioner whose IOLTA account had a balance of less than $70,000 when the counterfeit check for $362,400.25 was deposited into his account. The jury could reasonably conclude a teller acting in conformity with reasonable commercial standards of fair dealing would have placed a hold on that check

21

or advised him the funds, though available, were conditioned on the check not being returned as unpaid.

Additionally, while we agree with Bank that the issue is whether it "took" the item in good faith (see *Wachovia*, *supra*, 338 F.3d at p. 322 [when issue was Wachovia's good faith at the time of presentment, post-presentment activities not relevant]), we do not agree we are limited to examining Factora's state of mind at the time she briefly examined the check and took the deposit. Shortly after making the deposit, Methven's office manager called the bank to inquire about the availability of funds from the check. The jury, in connection with Methven's unsuccessful negligent misrepresentation claim, found that Bank employee Nguyen made a material misrepresentation of fact when informing him of the status of the funds. The jury could find an objective lack of good faith—a failure to observe reasonable commercial standards of fair dealing—in Nguyen's failure to specifically explain that even though the funds were available, the check could still be returned unpaid.

Bank suggests McCullough's testimony, which was critical of Bank's failure to specifically advise Methven that the credit for the check could be reversed if the check were dishonored, opened the "floodgates" to inadmissible evidence regarding the Bank's lack of ordinary care, which was not at issue in the case.[6] Bank overlooks the trial court's special instruction on good faith, which placed the burden of proving that "defense" on Methven, set forth the statutory definition of good faith, and provided: "Reasonable commercial standards of fair dealing is whether Mechanics Bank acted fairly in its conduct in taking the check for deposit, and does not relate to the care of Mechanics Bank in taking the check for deposit. You may not consider whether or not Mechanics bank exercised ordinary care in taking the check for deposit in connection with Methven's defense of lack of good faith." We presume the jury followed this

---

[6] As previously noted, the trial court sustained Bank's demurrer to Methven's negligence cause of action without leave to amend on the ground it was inconsistent with the CUCC. This ruling is not challenged on appeal.

instruction and did not equate good faith to a lack of negligence. (See *Craddock v. Kmart Corp.* (2001) 89 Cal.App.4th 1300, 1308 [jury presumed to follow court's instructions].)

## G. *Breach of Contract—Failure to Avoid Damages (Bank)*

In its special verdict, the jury found Methven breached his contract with Bank causing damages of $107,561.99 (the unpaid amount of the overdraft), but Bank could have avoided the full amount of damages with reasonable efforts or expenditures.[7] Bank argues, as it did in its motion for judgment notwithstanding the verdict, that the finding regarding avoidable damages was unsupported by substantial evidence because the breach of contract was Methven's failure to pay the balance on the overdraft pursuant to his written account agreement, and there was no action Bank could have taken to mitigate its damages *after* this breach occurred. (See *Brandon & Tibbs v. George Kevorkian Accountancy Corp.* (1990) 226 Cal.App.3d 442, 460 [applying substantial evidence standard to finding on mitigation of contractual damages].) We agree.

Under the doctrine of avoidable consequences, "a person injured by another's wrongful conduct will not be compensated for damages that the injured person could have avoided through reasonable effort or expenditure." (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1043.) Sometimes referred to as the duty to mitigate damages, "commentators have criticized the use of the term 'duty' in this

---

[7] The jury returned the following special verdict form on the Bank's cause of action for breach of contract: "1. Were the contract terms clear enough so that the parties could understand what each was required to do? Yes. 2. Did the parties agree to give each other something of value? Yes. 3. Did the parties agree to the terms of the contract? Yes. 4. Did Mechanics Bank do all, or substantially all, of the significant things that the contract required it to do? Yes. 5. Did all the conditions that were required for Mr. Methven's performance occur or were they excused? Yes. 6. Did Mr. Methven fail to do something that the contract required him to do? Yes. 7. Was Mechanics Bank harmed by that failure? Yes. 8. What are Mechanics Bank's damages? $107,561.99. 9. Could Mechanics Bank have avoided any of its damages with reasonable efforts or expenditures? If so, how much? $107,561.99. 10. Did Mr. Methven prove by clear and convincing evidence that Mechanics [Bank] gave up any rights that it had to have Mr. Methven perform his obligations under the contract because it both (1) knew that Mr. Methven was required to perform these obligations; and (2) freely and knowingly gave up any right to have Mr. Methven perform these obligations? No."

23

context, arguing that it is more accurate to state simply that a plaintiff may not recover damages that the plaintiff could easily have avoided." (*Ibid*.) Regardless of the terminology used, a plaintiff who suffers damage as a result of a breach of contract or a tort "may not recover for damages avoidable through ordinary care and reasonable exertion." (*Valle de Oro Bank v. Gamboa* (1994) 26 Cal.App.4th 1686, 1691 (*Valle de Oro*).)

The issue of avoidance or mitigation of damages "[t]ypically. . . comes into play when the event producing injury or damage has already occurred and it then has become the obligation of the injured or damaged party to avoid continuing or enhanced damages through reasonable efforts." (*Valle de Oro*, *supra*, 26 Cal.App.4th at p. 1691.) "One has an obligation to avoid an unwarranted *enhancement* of damages 'through passive indifference or stubborn insistence upon a conceived legal right . . . .' " (*Ibid*., italics added.) The relevant time frame for determining whether reasonable efforts would have been effective is " 'after a legal wrong has occurred, but while some of the damages may still be averted.' " (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1066; see *Barthelemy v. Orange County Flood Control Dist.* (1998) 65 Cal.App.4th 558, 572 [landowner would not be required to borrow several million dollars to acquire relocation property to mitigate damages in condemnation action when entity contemplating condemnation had not taken formal action to acquire the site]; *White v. Atlantic Richfield Co.* (9th Cir. 1991) 945 F.2d 1130, 1133 (*White*) ["A nondefaulting party must act reasonably under the circumstances so as 'not to unnecessarily *enlarge* damages caused by default' " (italics added)].)

That mitigation efforts need not be taken prior to a breach of contract is illustrated by *Valle de Oro*, *supra*, 26 Cal.App.4th at pages 1688-1689. In that case, a bank made a secured loan of $79,075 for the purchase of a vehicle, contingent on the borrower carrying adequate insurance. The borrower did not secure adequate insurance and defaulted on the loan after the vehicle was destroyed. (*Id*. at pp. 1689-1690.) In a lawsuit brought by the bank against the borrower to recover the balance due on the note, judgment was entered in favor of the borrower on the theory the bank could have

mitigated its damages by exercising an option under the contract to obtain its own insurance on the vehicle. (*Id*. at p. 1690.) The appellate court reversed: "Use of the doctrine [of mitigation of damages] in this case did not provide a shield against the unwarranted piling up of damages, but rather constituted a sword against the Bank's contractual right to recover damages resulting from [borrower]'s admitted breach of contract. The Bank had fully performed under the contract by disbursing loan proceeds of $79,000 to [borrower]. The contractual obligation to secure comprehensive insurance on the vehicle was [borrower]'s, not that of the Bank. When [borrower] allowed his insurance coverage to lapse and when he thereafter arranged for renewal of coverage for less than the amount of the loan balance, no damage producing event had yet occurred. The vehicle which collateralized the loan still existed and [borrower] continued to make scheduled loan payments. Simply put, there was no damage for the Bank to mitigate, and it was still the Bank's contractual *option*, not *obligation*, to secure its own insurance coverage." (*Id*. at p. 1694.)

In the case before us, the breach of contract by Methven was his failure to pay the balance of the overdraft resulting from Bank's revocation of the provisional credit it had extended when the counterfeit check was deposited. By the time this breach occurred, the money had already been wired out of the IOLTA account, and Bank's only avenue of mitigating its damages was to seek a return of money from the banks in Japan that had received the wire transfers. The evidence shows Bank attempted to do this but was not successful, and Methven makes no claim Bank could have taken additional steps to retrieve the money it had wired. Given these facts, which are not in dispute, substantial evidence does not support the finding the Bank could have avoided or mitigated the damage caused by Methven's breach of contract through reasonable efforts. (See *White*, *supra*, 945 F.2d at p. 1133 [significant point in time for mitigation analysis is date on which breach occurred].)

Methven suggests the breach of contract was not limited to his failure to repay the overdraft, because "the entire episode was triggered by the deposit of the counterfeit check, the Bank's misrepresentations about the [c]heck and/or the wire transfers out of

25

the account." Thus, he argues, the jury could have treated Bank's earlier omissions—the failure to detect the counterfeit nature of the check, the statements to Methven and his agents about the status of the check, and the wiring of uncollected funds—as a failure to mitigate damages. We are not persuaded, because the presentation of the check for deposit was not the breach of contract. Counsel for Bank stated during closing argument that Methven's breach of contract was his failure to "reimburse it for moneys that he paid out of his account based upon a provisional credit and because the check was returned," and the jury was instructed Bank "claims damages for the monies wired out of Mechanics Bank at the request of Mr. Methven as to which it has not received reimbursement." No other instruction or aspect of the argument suggested Methven breached any provision of his account agreement with Bank other than the one requiring him to repay the amount of an overdraft.

Methven's argument is less a claim that Bank should have avoided or mitigated the damages caused by his refusal to pay the balance on the overdraft than an argument that Bank's earlier actions and omissions were intervening and/or superseding causes of the loss that relieved Methven of liability. "The defense of intervening and superseding cause applies in tort cases. In contract cases, the defense does not absolve the defendant of liability. . . . As one authority has noted, 'Breach may not be precluded, however, by the presence of other contributing causes—multiple or intervening. Although the injured party's own failure to avoid loss may bar recovery for that loss, this is not thought of as a consequence of a requirement of causation but of a limitation under a "mitigation" rule.' " (*Ash v. North American Title Co.* (2014) 223 Cal.App.4th 1258, 1274-1275.)

Methven suggests the jury was entitled to consider Bank's lack of mitigation efforts prior to the actual breach of contract. He relies primarily on *Thrifty-Tel, Inc. v. Bezenek* (1996) 46 Cal.App.4th 1559, 1568-1569 (*Thrifty-Tel*), a decision we find distinguishable.

In *Thrifty-Tel*, a telephone long-distance carrier sued the parents of teenage boys who had used the family computer to hack into the carrier's system and make calls without paying for them. (*Thrifty-Tel*, *supra*, 46 Cal.App.4th at p. 1563.) The boys first

26

hacked into the system during a three-day period in November 1991, and, after a three-month hiatus, struck again in February 1992. (*Id*. at p. 1564.) Though their phone number and address had been identified by the carrier through its internal security system by the end of November 1991, the carrier took no steps to contact the parents and the parents learned of the hacking for the first time when the carrier filed a lawsuit in April 1992. (*Ibid*.) The evidence was unrebutted the parents would have put a stop to the boys' activities if they had been notified. (*Id*. at pp. 1568-1569.)

The court of appeal reversed a judgment in favor of the long-distance carrier, holding the carrier had failed to mitigate its damages by failing to contact the boys' parents after it learned of the first hacking incident. (*Thrifty-Tel*, *supra*, 46 Cal.App.4th at pp. 1568-1569.) In its brief discussion of the issue, the court cited the rule a plaintiff cannot recover losses it could have avoided through reasonable efforts and explained: "Thrifty-Tel's only response is that mitigation does not ' "require a complex series of doubtful acts and expenditures." ' Picking up the telephone to reach out and touch the [parents] or sending them a letter was complex, doubtful, or expensive? Based on [the boys' father's] unchallenged testimony, we must presume that simple expedient would have averted the second hacking episode. Accordingly, Thrifty-Tel is not entitled to recover damages for the February 1992 event." (*Ibid*.)

*Thrifty-Tel* does not support Methven's claim a party who breaches a contract may assert a failure to avoid or mitigate damages based on actions that might have been taken by the other party before the breach occurred. The long-distance carrier in *Thrifty-Tel* presented no evidence it suffered actual losses, but relied on an "unauthorized usage" tariff published by the Public Utilities Commission to establish damages in its claims for fraud and conversion, which liquidated the amount of damages by imposing a $2,880 per day surcharge, a $3,000 setup fee, and a $200 per hour labor fee. (*Thrifty-Tel*, *supra*, 46 Cal.App.4th at pp. 1564-1565.) Once the carrier learned of the hacking after the first instance, it could have taken reasonable steps to prevent additional damages, namely, additional instances of unauthorized use, but it failed to do so. Applying the doctrine of avoidance or mitigation of damages was appropriate because it acted as a "shield against

the unwarranted piling up of damages." (*Valle de Oro*, *supra*, 26 Cal.App.4th at p. 1694.)

In the case before us, by contrast, Bank did not suffer any loss until Methven refused to pay the overdraft constituting the breach, and to say it could have avoided or mitigated damages would be to say it was required to prevent the breach itself. It would be " 'unreasonable or impracticable' " to impute the responsibility for Methven's breach to the Bank and would " 'entirely transfer[] to [Bank]'s shoulders the burden of [Methven]'s violated obligation.' " (*Valle de Oro*, *supra*, 26 Cal.App.4th at pp. 1691, 1693-1694.)

Moreover, *Thrifty-Tel* was an action in tort, and while the doctrine of avoidance or mitigation of damages applies to both contract and tort cases, it "is used sparingly in the contract or commercial context." (*Valle de Oro*, *supra*, 26 Cal.App.4th at p. 1691.) " 'No case has been called to our attention wherein this rule as to the duty to minimize the damages has been applied to a situation in which the defendant's breach of duty consisted solely of the failure or refusal to pay a liquidated sum of money when due, and it may perhaps be doubted that the rule is applicable to such a case.' " (*Id*. at p. 1692, citing *Vitagraph, Inc. v. Liberty Theatres Co.* (1925) 197 Cal. 694, 698-699.)

Methven urges us to uphold the jury's finding that Bank failed to avoid damages because that finding can be reconciled with the modified version of CACI No. 358 given at trial: "If Mr. Methven breached the contract and the breach caused harm, Mechanics Bank is not entitled to recover damages for harm that Methven proves Mechanics Bank could have avoided with reasonable efforts or expenditures. You should consider the reasonableness of Mechanics Bank's efforts in light of the circumstances facing it at the time, including its ability to make the efforts or expenditures without undue risk or hardship." Methven argues this instruction, to which neither party objected, allowed the jury to consider actions Bank might have taken before the breach occurred.

In support of this contention, Methven relies on the rule of appellate review stated in *Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1535 (*Null*): "[W]here a party to a civil lawsuit claims a jury verdict is not supported by the evidence, but asserts

28

no error in the jury instructions, the adequacy of the evidence must be measured against the instructions given the jury." The defendant in *Null* had challenged the sufficiency of the evidence without providing a copy of the relevant jury instructions, and the court was concerned that undertaking such a review could require a retrial on a theory never tendered by the parties, even though neither the jury nor the court committed error. (*Id.* at pp. 1534-1535; see *Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 675.) We do not face that situation here, because the record shows the jury received CACI No. 358 and the only question is whether the evidence supported a finding of reasonable mitigation efforts under the relevant principles of law. We also agree with Bank that CACI No. 358, properly construed, did not permit the consideration of pre-breach conduct when evaluating whether Bank could have avoided its damages. The first sentence of that instruction refers to a "breach" that causes "harm." The second sentence directs the jury to consider the reasonableness of Bank's efforts "in light of the circumstances facing it at the time," which refers back to the breach mentioned in the first sentence.

Because the evidence does not support the jury's finding bank could have avoided or mitigated the damages for breach of contract based on the failure to repay the overdraft, we reverse that aspect of the judgment and order the court to enter judgment in Bank's favor in the amount of $107,561.99, as determined by the jury in its special verdict.

## III. DISPOSITION

The judgment in favor of Methven on Bank's breach of contract claim is reversed, and the trial court is directed to enter judgment in favor of Bank in the amount of $107,561.99. Bank shall recover its ordinary costs on appeal.

_____
NEEDHAM, J.

We concur.


_____
SIMONS, Acting P.J.


_____
BRUINIERS, J.